UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

| | |
|---|---|
| CASEY LYNN CROW GHOST<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | 1:24-CV-01016-CBK<br><br>**MEMORANDUM OPINION AND ORDER DENYING MOTION TO VACATE AND ORDER DENYING A CERTIFICATE OF APPEALABILITY** |

Petitioner was convicted by a jury of first-degree murder and use of a firearm during a crime of violence, 1:21-cr-10003-CBK. He filed a motion for judgment of acquittal or for a new trial, which motion was denied after a thorough review of the evidence presented at trial. United States v. Ghost, 2022 WL 16920159 (D.S.D. 2022). Petitioner was sentenced on November 14, 2022, to concurrent terms of life imprisonment on both counts. Petitioner appealed his convictions and sentences and the United States Court of Appeals for the Eighth Circuit affirmed. United States v. Crow Ghost, 79 F.4th 927 (8th Cir. 2023).

Petitioner has filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. Petitioner contends that his Fifth Amendment right to due process and Sixth Amendment right to the assistance of counsel was violated in connection with statements he made to investigators and when those statements were admitted at trial. He further contends that his attorneys were ineffective in failing to investigate possible defenses, seek suppression of his statements, object during testimony about those statements at trial, object to the admission of the recorded statements at trial, and request certain jury instructions. Finally, petitioner contends that there was insufficient evidence to sustain the convictions.

I have conducted an initial consideration of the motion, as required by Rule 4 of the Rules Governing Section 2255 Proceedings for the United States District Courts.

## DECISION

The United States Court of Appeals for the Eighth Circuit set forth the background of this case on direct appeal, set forth below in relevant part.

> Crow Ghost and his girlfriend, Allison Archambault, had a sometimes tumultuous relationship. Archambault's family enlisted the help of law enforcement when they were unable to contact Allison for several days. On December 15, 2020, a Bureau of Indian Affairs officer went to Crow Ghost's apartment in Mclaughlin, South Dakota. Six or seven of Archambault's family members escorted the officer to the rear of Crow Ghost's apartment and pointed to blood on the ground and back door. After radioing dispatch, the acting chief of police directed the officer to contact tribal housing for access into the apartment to conduct a welfare check.
>
> When the officer stepped inside Crow Ghost's apartment, he almost immediately sensed the odor of a decaying body. Entering the kitchen area, the officer found Archambault face down on the floor surrounded by blood and wearing only one shoe. Archambault's other shoe was found at the threshold between the living room and the bedroom, and her cell phone was located on the kitchen table with a bloody fingerprint. No weapons were found near the body. While Crow Ghost was not inside the apartment, his car was parked in front of neighbor Leslie Confer's residence. Additional officers were summoned to help search for Crow Ghost. When the officers asked Confer and her son if Crow Ghost was inside, they responded that they did not believe Crow Ghost was present. Confer consented to a search of her residence and officers found Crow Ghost hiding in the dark behind the bathroom door.
>
> At 3:20 a.m. on December 16, 2020, Federal Bureau of Investigation agents interviewed Crow Ghost. Crow Ghost told the agents that he began drinking with Archambault at noon on Friday, December 11, 2020, and continued drinking with her on Saturday. After an argument erupted, Archambault threw things at him, called him names, hit him, tried to pull off his glasses, pulled his hair, grabbed two knives from a kitchen draw (sic), and threatened to kill him. Crow Ghost claimed Archambault went to his bedroom closet to get a .45 caliber Sig Sauer pistol that Crow Ghost had purchased two months earlier. Archambault inserted the clip in the firearm, cocked it, and told Crow Ghost she hated him and wished he was dead. A struggle ensued, the gun went off, and Archambault fell to the floor,

2

unresponsive. Crow Ghost indicated the shooting happened sometime around 5:00 p.m. on Saturday, December 12, 2020. Scared, Crow Ghost left the apartment with the firearm and drove around, eventually stopping and staying the night at his cousin's house. When agents told Crow Ghost that Archambault was dead, Crow Ghost reported that Archambault had been abusive toward him, and he acted in self-defense. Crow Ghost did not have any obvious injuries. Crow Ghost explained he had had no contact with Archambault after the shooting because he believed Archambault and a friend had gone to California. At the end of the interview, Crow Ghost told the agents where the gun was located, and he gave a sample of his DNA.

During the search of Crow Ghost's apartment, agents did not find any knives out of place. In Crow Ghost's bedroom, they found a bloody pair of pajama pants rolled up on the floor. They also found a cardboard box in the closet containing, among other things, a handgun magazine.

One week later, law enforcement interviewed Crow Ghost a second time. Crow Ghost stated that he did not tell the truth during his first interview. Crow Ghost told the agents during this interview that after Archambault had threatened him with knives, he pushed Archambault away, took a gun from the kitchen counter, aimed the gun at her, and shot Archambault because she said she wanted to kill him. Before this interview, one of the agents had discussed with Crow Ghost the difference between premeditated murder and murder during the heat of passion so Crow Ghost wanted to clarify that he had shot Archambault in the heat of passion. Crow Ghost also reported that, after the shooting, Archambault was bleeding and trying to leave and use her phone when he grabbed her arm and escorted her back into the apartment.

At trial, the forensic pathologist who conducted an autopsy of Archambault's body testified that Archambault died of a single gunshot wound to the back of the head near the right ear area. The pathologist opined that Archambault sustained "a distant wound" to her head, meaning it was inflicted back-to-front from at least three feet away, as there was no gunshot residue or stippling on her head. The pathologist also observed bruising on the back of Archambault's hands. A DNA expert testified that the blood on Crow Ghost's apartment door was likely from Archambault. The gun contained blood on the front sight, which consisted of both male and female DNA. According to the expert's testimony, it was "equally likely" that Crow Ghost was the contributor to the male DNA as an unknown source and "very strong support" that Archambault was the contributor of the female DNA when compared to an unknown source. Two

3

magazines were tested—one from the gun and one found in a closet—and only Crow Ghost's fingerprints were found on the magazines.

* * *

Crow Ghost testified in his own defense. At trial, he provided a third version of the events leading to the shooting. He testified that on the day Archambault died, Archambault accused him of having a sexual relationship with others, including her sister, and she attacked him in the kitchen. According to this version, as Crow Ghost tried to fend off Archambault, they ended up falling in the living room and continued wrestling. They both eventually got up and moved toward the backdoor when Archambault attempted to grab for knives along the way. They pushed each other outside and Crow Ghost asserts Archambault head-butted him on the side of his face. The pair ended up back inside the living room and, according to Crow Ghost, Archambault then walked into his bedroom, opened the closet, and retrieved a box from his closet which at one time had contained a gun. While Archambault was rummaging through the box, Crow Ghost grabbed the gun, which was still inside the closet. As they wrestled in the bedroom, one of Archambault's shoes came off. Crow Ghost decided the best thing for him to do was leave. But according to Crow Ghost, once Archambault saw that Crow Ghost had gotten his car keys and was walking out the back door, Archambault grasped his hair and pulled him back inside the apartment. Crow Ghost grabbed his gun and when Archambault tried to take the gun away from Crow Ghost, it discharged, causing Archambault to fall on the threshold of the backdoor. Crow Ghost dragged the unresponsive Archambault inside the apartment so he could close and lock the backdoor. Crow Ghost changed out of his bloody pajama pants, took his dog, and drove toward Mobridge, eventually arriving in Kenel at his dad's house where he stayed the night. Crow Ghost told the jury that when he left his apartment after the shooting, he assumed Archambault was dead.

According to Crow Ghost, he left his dad's house the next morning and drove "aimlessly" until eventually returning to McLaughlin sometime on Tuesday. Crow Ghost claimed that he did not have a key to get back inside his apartment because Archambault had taken his only key to have a duplicate made. Crow Ghost drove to neighbor Confer's house because she had a spare key for his apartment. When he arrived at her house, Confer asked for a ride to the grocery store so Crow Ghost left with Confer without going into his apartment.

4

United States v. Crow Ghost, 79 F.4th at 931–33.

## I. Sufficiency of the Evidence.

Petitioner raised on appeal his claim that there was insufficient evidence of his guilt and the Eighth Circuit rejected that claim. "It is well settled that claims which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255." Bear Stops v. United States, 339 F.3d 777, 780 (8th Cir. 2003) (*quoting* United States v. Shabazz, 657 F.2d 189, 190 (8th Cir. 1981)).

The Eighth Circuit has recognized a miscarriage-of-justice exception to the rule of relitigating matters decided on direct appeal. United States v. Wiley, 245 F.3d 750, 752 (8th Cir. 2001). However, the exception is narrow and available only in an 'extraordinary case" where petitioner produces "convincing new evidence of actual innocence." United States v. Wiley, 245 F.3d at 752, *citing* Schlup v. Delo, 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

Petitioner has not identified any new evidence that would detract from the jury verdicts in this case. The Eighth Circuit found ample evidence that petitioner committed premeditated murder and there is no question that such murder was committed with a firearm. There is no basis in the record or in the petition to show that petitioner is actually innocent of the crimes for which he was convicted and sentenced in this case.

## II. Fifth Amendment Claim.

Petitioner contends that his Fifth Amendment Right to Due Process was violated when two recorded statements were offered into evidence. Petitioner contends that such statements were made without Miranda[1] warnings and in violation of his Sixth Amendment right to the assistance of counsel. In a supplemental brief, petitioner contends that the second statement was coerced. In the supplemental brief, petitioner contends that there was a delay in bringing plaintiff before a magistrate judge and such unnecessary delay rendered his first statement inadmissible at trial.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Petitioner's Fifth Amendment claims were required to be raised on direct appeal. The United States Supreme Court has "long and consistently affirmed that a collateral challenge may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165, 102 S. Ct. 1584, 1593, 71 L. Ed. 2d 816 (1982).

> Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either "cause" and actual "prejudice," *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 2643-2644, 91 L.Ed.2d 397 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506-2507, 53 L.Ed.2d 594 (1977), or that he is "actually innocent," *Murray, supra*, at 496, 106 S.Ct., at 2649-2650; *Smith v. Murray*, 477 U.S. 527, 537, 106 S.Ct. 2661, 2667-2668, 91 L.Ed.2d 434 (1986).

Bousley v. United States, 523 U.S. 614, 622, 118 S. Ct. 1604, 1611, 140 L. Ed. 2d 828 (1998).

Petitioner contends that the "cause" of failing to assert an error on appeal was that trial counsel was ineffective in failing to move to suppress the statements or to request a voluntariness hearing. The condition petitioner must meet to proceed on his Fifth and Sixth Amendment claims surrounding voluntariness of his statements is identical to his Sixth Amendment claim that he received ineffective assistance of counsel in connection with the statements. *See* Becht v. United States, 403 F.3d 541, 545 (8th Cir. 2005). It is appropriate to address first whether counsel was ineffective in failing to move to suppress the statements made by the petitioner.

## III. Ineffective Assistance of Counsel.

To support a claim of ineffective assistance of counsel, a two-prong test must be met. "To succeed on this claim, [petitioner] must show ineffective assistance--that counsel's representation fell below an objective standard of reasonableness." Wilcox v. Hopkins, 249 F.3d 720, 722 (8th Cir. 2001) (*quoting* Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). Petitioner "must also prove prejudice by demonstrating that absent counsel's errors there is a reasonable probability that the result of the proceeding would have been different." Delgado v. United States, 162 F.3d 981, 982 (8th Cir. 1998), (*citing* Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct.

2052, 2068, 80 L. Ed. 2d (1984)).  The burden of establishing ineffective assistance of counsel is on the petitioner.  Delgado v. United States, 162 F.3d at 982.  Petitioner "'faces a heavy burden' to establish ineffective assistance of counsel pursuant to section 2255."  DeRoo v. United States, 223 F.3d 919, 925 (8th Cir. 2000) (quoting United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996)).  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."  Yarborough v. Gentry, 540 U.S. 1, 8, 124 S. Ct. 1, 6, 157 L. Ed. 2d 1 (2003).

### A. Failure to Move to Suppress Statements.

"[T]he failure to file a suppression motion does not constitute per se ineffective assistance of counsel."  Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 2587, 91 L. Ed. 2d 305 (1986).  When petitioner claims counsel was ineffective for failing to file a motion to suppress, petitioner "must prove that the claim is meritorious."  United States v. Luke, 686 F.3d 600, 605 (8th Cir. 2012).  In determining whether petitioner was prejudiced by the failure to file a motion to suppress, this Court must consider whether the motion, if made, would have been successful.  United States v. Johnson, 707 F.2d 317, 320 (8th Cir. 1983).  Where there is indisputable evidence that petitioner was advised of his Miranda rights and petitioner indicated that he understood those rights and waived them, such evidence would have made a motion to suppress unsuccessful.  Griffin v. United States, 617 F. App'x 618, 625 (8th Cir. 2015).

There is no question whether petitioner was advised of his Miranda rights prior to the first interview.  The interview was recorded and there is no question as to what transpired.  At the beginning of the interview, an FBI Special Agent read to petitioner his Miranda rights along with an extra caution that, "[i]f you decide to answer questions now, without a lawyer present, you have the right to stop at any time.  Stop answering at any time."  Petitioner read out loud a statement that he understood his rights and was willing to make a statement without a lawyer present.  Petitioner inquired what would happen if he needed a lawyer present.  He was advised, "well then, you go get a lawyer and then we ask you questions, if you wish."  Petitioner indicated he had nothing to hide and immediately offered that: "It was self-defense."  The interview concluded at 4:32 a.m.

The recording of the first interview is unrefuted evidence that petitioner was not coerced, harassed, or otherwise unduly influenced to make the statements he made.

A second interview was conducted on December 22, 2020, by two FBI Special Agents. Petitioner was still in tribal custody. This interview was also recorded and the recording was also played for the jury. Petitioner was asked whether he was advised of his constitutional rights prior to the beginning of the recording and petitioner indicated in the affirmative. At the start of this interview, petitioner claimed that the victim retrieved his gun from his bedroom, he and the victim were wrestling for the gun, and that petitioner took the gun from the victim and shot her. At that point, a discussion was held with petitioner inquiring whether he wanted to talk to the Special Agent conducting the interview or wanted to assert his right to an attorney. The following colloquy occurred:

Special Agent:     "You stated you still wanted to talk to me, and you did not assert your right to an attorney, correct?"

Petitioner:          "Right."

Special Agent:     "Is that correct?"

Petitioner:          "Correct."

Special Agent:     "Okay. So you wanted to talk to us without an attorney present, correct?"

Petitioner:          "Yes."

The second interview lasted approximately 40 minutes and concluded at 2:30 p.m. Although not part of the written record in this case, the Court, defendant, and counsel were aware that the second recorded interview took place following a polygraph examination. Evidence of the polygraph was of course not admitted.

Both statements made by petitioner in December 2020, occurred prior to January 15, 2021, when petitioner was writted out of tribal custody pursuant to the January 12, 2021, indictment. No motion to suppress the recorded interviews was filed despite three different attorneys having represented petitioner at separate times between the time of petitioner being taken into federal custody on January 15, 2021, and the August 9, 2022, trial.

Petitioner cannot carry his burden to show that counsel was ineffective in failing to move to suppress the statements he made while in tribal custody. It is clear that petitioner was advised of his rights. He has not shown that he was under duress or was otherwise coerced into making statements. The tape recordings are the best evidence of the tenor of the questioning. Counsels' failure to file a meritless suppression motion does not constitute ineffective assistance. homas v. United States, 951 F.2d 902, 905 (8th Cir. 1991).

As previously set forth, petitioner bears the burden of showing prejudice - that, absent counsel's alleged ineffective assistance, there is a reasonable probability that the result of the proceeding would have been different. Delgado v. United States, 162 F.3d at 982. Petitioner must show that but for counsel's alleged ineffective advice, he would not have been convicted at trial or that his sentence would have been lower. Petitioner cannot show that the outcome of his case would have been different had counsel performed differently. Petitioner cannot show that, if counsel had made a motion to suppress and had that motion been successful, the outcome of the trial would have been different. Allison Archambault's family could not contact her for several days. There was no answer at petitioner's apartment but there was blood on the outside of the door and on the ground in front of the door. All outside doors were locked and there was no evidence that any person had previously forced their way into the apartment. When law enforcement gained entry into petitioner's apartment, they found the victim dead lying face down in a puddle of blood near the door. The victim had been shot at a distance to the back of the head and had been dead several days. Petitioner's blood-stained clothing was found rolled up and stashed in his apartment, showing that he had been present and changed after the murder. He had purchased a firearm shortly before the murder. The firearm was in his possession – in the bedroom he was occupying while hiding from authorities – and petitioner's fingerprints were on the magazine that was in that firearm, another magazine found in petitioner's home, and on the victim's bloody cell phone. Evidence was received at trial that the petitioner's relationship with the victim had been turbulent. Two years before the murder, petitioner had threatened a male friend of the

9

victim who was romantically interested in the victim and had gone on many weekend trips with the victim over the years. Two months prior to the murder, petitioner had confronted another man and accused him of cheating with the victim. Shortly after that confrontation, petitioner purchased a handgun. On the weekend of the murder, petitioner had intended to leave for the weekend with one of those male friends.

Petitioner has not carried his burden to show that there is a "reasonable probability that, but for counsel's alleged failure [as set forth *supra*] the result of the proceeding would have been different." Toledo v. United States, 581 F.3d at 680 (8th Cir. 2009). Lacking prejudice, petitioner's ineffective assistance of counsel claim as to the failure to file a motion to suppress, and petitioner's Fifth and Sixth Amendment claims that his confessions were not voluntary all fail.

### B. Failure to Raise Miranda Issue at Trial.

Petitioner contends that trial counsel was ineffective in failing to cross-examine the government's witnesses as to whether Miranda warnings were given prior to the interviews of the petitioner. Petitioner contends trial counsel was also ineffective in failing to object to the exhibits containing the recorded interviews. The government moved *in limine* to prohibit counsel from raising issues during trial which were required to be raised prior to trial. That motion was granted. Counsel was prohibited from inquiring about such matters during cross-examination. Counsel was not ineffective in following the Court's pretrial orders.

### C. Failure to Inquire About Bullet Trajectory.

Petitioner contends that trial counsel was ineffective in failing to cross-examine the officer who attended the autopsy of the victim about the trajectory of the bullet. The evidence at trial showed that the victim had been dead several days prior to discovery of the body and the resulting autopsy. The trajectory of the bullet could not be determined due to the breakdown of tissue and the condition of the victim's brain. Counsel was not ineffective in failing to cross-examine the law enforcement witness as claimed.

Petitioner contends that bullet trajectory would have shown that the shooting was accidental and that the blood on his clothing was not from shooting the victim but instead

from dragging the victim back inside after the shooting. Petitioner does not contend that he is innocent of shooting the victim but that he did not commit premeditated murder. He does not contend that he is actually innocent of shooting the victim resulting in her death.

### D. Failure to Subpoena Witness.

Petitioner contends that counsel was ineffective in failing to subpoena the agent who conducted the polygraph examination. The fact that a polygraph examination was conducted was not admissible in evidence. Further, any evidence that a polygraph was conducted could only have prejudiced petitioner, raising questions as to the outcome.

### E. Failure to Investigate.

Petitioner contends that counsel failed to request petitioner's YouTube play list. The Eighth Circuit has "stated that failing to interview witnesses or discover mitigating evidence may be a basis for finding counsel ineffective within the meaning of the Sixth Amendment right to counsel." Kramer v. Kemna, 21 F.3d 305, 309 (8th Cir. 1994). Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Chambers v. Armontrout, 907 F.2d 825, 828 (8th Cir. 1990) (quoting Strickland v. Washington, 466 U.S. at 691, 104 S.Ct. at 2066).

Petitioner contended during the first interview that, when the victim went to the YouTube play list on the television, she noticed new music on the recently viewed list and became angry, throwing things at petitioner, striking him, and threatening to kill him with a knife. During the second interview, petitioner stated that they were drinking, the victim became upset about the YouTube search on the television, wanting to know who played the songs. Petitioner stated that the victim retrieved his firearm and threatened to kill petitioner. They wrestled. Petitioner took the gun from her, aimed it, and shot her.

Petitioner contends that the victim's anger about the YouTube play list would prove that the crime was not premeditated but instead was a killing of "sudden quarrel provation." After reviewing the two statements, there is no basis for concluding that counsel was ineffective in failing to obtain the YouTube viewing list to corroborate petitioner's stories. Whether or not the victim was angry or jealous does not detract from

11

the evidence that the victim was shot in the back of the head from a distance, apparently at our outside the doorway, and then drug back into the home and left face down bleeding. The victim's alleged jealousy and anger as to any alleged other person watching YouTube at petitioner's home is irrelevant to petitioner's provocation for killing the victim.

## IV. Motion to Appeal Without Prepayment of Fees.

Petitioner moved to appeal without the prepayment of fees. A motion to vacate is not an appeal. Further, there is no filing fee for a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. Rules Governing Section 2255 Proceedings for the United States District Courts, Advisory Committee Notes to the 1976 Adoption. Any motion to proceed *in forma pauperis* is moot.

## VI. Evidentiary Hearing.

The district court must hold an evidentiary hearing on a § 2255 motion which presents factual issues. United States v. Lambros, 614 F.2d 179, 181 (8th Cir. 1980). However, a § 2255 "petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible or conclusions rather than statements of fact." Delgado v. United States, 162 F.3d 981, 983 (8th Cir. 1998) (*quoting* Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995)). No evidentiary hearing is necessary in this case because it plainly appears from the face of the motion, after extensive review of the record, that the petitioner is not entitled to relief on any issues. Summary dismissal is therefore appropriate pursuant to Rule 4 of the Rules Governing Section 2255 Proceedings for the United States District Courts.

## ORDER

I have determined, upon initial consideration, that it plainly appears from the face of the motion and the prior proceedings in the criminal case that petitioner is entitled to no relief and that his motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 should be summarily dismissed. I do not do so lightly. Petitioner was

12

convicted of first-degree murder and use of a firearm during a crime of violence. He is serving life imprisonment. I therefore gave careful consideration of petitioner's motion to vacate. I was the judge who conducted the jury trial, considered the motion for judgment of acquittal and for a new trial, and sentenced the defendant. I have carefully reviewed the trial transcripts and exhibits and have thoroughly considered petitioner's claims. I find no basis for vacating petitioner's convictions or sentences.

Based upon the forgoing,

IT IS ORDERED:

1. The motion to vacate, set aside, or correct sentence is denied.

2. The motion, Doc. 4, to proceed *in forma pauperis* on appeal is denied as moot.

3. The motion, Doc. 9, for the appointment of counsel is denied.

4. The motion, Doc. 10, for a status report is denied as moot.

IT IS HEREBY CERTIFIED that there does not exist probable cause of an appealable issue with respect to the Court's order denying petitioner's § 2255 motion. No certificate of appealability will be granted. This in no way hampers the petitioner's ability to request issuance of the certificate by a circuit judge pursuant to Fed. R. App. P. 22.

DATED this 27th day of April, 2026.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

13